# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| ELIZABETH BILBIJA and ROBERT BILBIJA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-02124-TWP-MJD |
| | ) |
| CHRISTOPHER T. LANE, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Christopher T. Lane ("Lane") ([Filing No. 44](#)). Plaintiffs Elizabeth and Robert Bilbija ("the Bilbijas"), brought this lawsuit for legal malpractice against Lane, alleging that Lane engaged in a prohibited dual representation of them along with non-party Ryan Thompson ("Thompson"), in documenting a loan from the Bilbijas to Thompson. They further contend that Lane failed to secure the loan through payments to Thompson from a Major League Baseball ("MLB") pension. Lane, an Indianapolis attorney, seeks summary judgment, asserting that no attorney-client relationship existed with the Bilbijas to support a legal malpractice claim, and there is no cause of action for their conflict of interest claim. For the following reasons, the Court **grants in part and denies in part** the Motion for Summary Judgment.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the Bilbijas as the non-

moving parties. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Ryan Thompson is a retired major league baseball player. In 2014, the Bilbijas and Thompson met through their sons, as both of their sons played college basketball. Thompson and the Bilbijas are Christians and they became close friends. (Filing No. 49-2 at 10-11.) The Bilbijas considered Thompson part of their family. *Id.* 11. On June 9, 2014, the Bilbijas executed a promissory note with Thompson and his wife, Charon Thompson, for the amount of $70,000.00 ([Filing No. 49-1 at 2](#)). Lane was not involved in preparing this promissory note ([Filing No. 49-2 at 6](#)–7). The Bilbijas loaned $70,000.00 to the Thompsons to assist them with their financial troubles, and the promissory note memorialized the debt and obligation to repay the debt. *Id.* at 10–11.

The following month, in July 2014, Thompson informed the Bilbijas that he had ongoing financial troubles and legal problems and asked them to loan him an additional $42,500.00 to help him avoid jail for fraud charges. *Id.* at 11–12. However, Thompson did not inform the Bilbijas that he had already entered a guilty plea on the fraud charge in January 2014. *Id.* at 18. The Bilbijas told Thompson that the only way they would loan him an additional $42,500.00 was if an attorney helped with the transaction. *Id*. at 15.

Thompson informed the Bilbijas that he could protect the loan with his Major League Baseball pension, from which he received $8,000.00 per month, and he could repay them $2,000.00 per month from this pension if they agreed to loan him the additional money ([Filing No. 49-2 at 25](#)). He also told them that he would be able to repay them within 120 days of July 23, 2014, because he anticipated obtaining a large contract worth more than $300,000.00 through a business venture. *Id.* at 45.

After talking with Thompson's criminal defense attorney, the Bilbijas decided to loan the additional money to Thompson. *Id.* at 31. The Bilbijas explained to Thompson that "the only way [they] would ever lend him more money is that [they] needed security, and he agreed to put the money, the $42,500, on a promissory note drawn up by a lawyer to secure it." *Id.* at 20.

Because they lived in Canada, the Bilbijas asked Thompson to find an attorney for them to assist in the transaction. *Id.* at 15. An attorney who knew Thompson called Lane in July 2014 and asked if he could provide Lane's telephone number to Thompson. Lane was unfamiliar with Thompson and Lane had never previously represented Thompson. ([Filing No. 49-6 at 6](Filing No. 49-6 at 6), 10.) Thompson did not tell the Bilbijas that Lane would be representing both the Bilbijas and Thompson, but he did tell them that he had "an attorney who can draw up this promissory note for us." ([Filing No. 49-7 at 6](Filing No. 49-7 at 6).)

Prior to meeting with the Bilbijas and Thompson, Lane had never prepared a promissory note that was secured by anything, and he had never secured a debt with any type of professional sports pension. His law practice at that time involved criminal defense, family law, credit issues, and small business law ([Filing No. 49-6 at 6](Filing No. 49-6 at 6)–9). Lane and Thompson did not execute a written attorney-client fee agreement even though Lane generally used such fee agreements. *Id.* at 32. On July 23, 2014, Lane met with the Bilbijas and Thompson for approximately two hours at his law office ([Filing No. 49-2 at 33](Filing No. 49-2 at 33)–34). The Bilbijas believed that Lane was representing them as well as Thompson in the promissory note transaction. Lane verbally communicated to Mrs. Bilbija that he was representing all of them. *Id.* at 27–28. If Lane had explained to them that he was representing Thompson only, the Bilbijas would have walked out of his office. *Id.* at 53. Mrs. Bilbija specifically asked Lane if she and her husband needed their own attorney, and Lane

3

answered, "[N]o, I do this all the time, this is what I specialize in, contract law for athletes. I do garnishments. This is my specialty." *Id.* at 52.

Lane admits that he did not believe the Bilbijas were represented by another attorney, he did not advise the Bilbijas that they should be represented by separate counsel, and he did not specifically advise the Bilbijas that he did not represent them (Filing No. 49-6 at 26). Moreover, Lane did not provide a disclaimer to the Bilbijas to inform them that he was representing Thompson only (Filing No. 49-2 at 22).

At the time of the meeting on July 23, 2014, Lane informed the parties that his legal fees were $500.00. The Bilbijas paid Lane $250.00 in cash. Mrs. Bilbija told Lane that he could put the $250.00 toward their half of the legal fees. The Bilbijas asked for a receipt for their payment, but Lane did not have a receipt book. *Id.* at 37. Thompson also paid Lane $250.00. *Id*. at 40. Lane accepted $500.00 in cash for payment for his legal services. *Id.* at 37, 53.

During the meeting, Lane presented a promissory note to Thompson and the Bilbijas. Mrs. Bilbija questioned why the note did not include Mrs. Thompson and she told Lane that the note was not strong enough. She asked Lane to make it stronger. Lane explained that Thompson's wife was not employed. Thompson changed some of the clauses in the note to make it stronger. *Id.* at 24. The Bilbijas suggested that the loan could be secured with Thompson's house, and Lane responded that Thompson possibly could have multiple mortgages on his house. *Id.* at 22. Lane brought up the possibility of securing the loan with Thompson's MLB pension (Filing No. 49-7 at 13).[1] Lane also recommended that the $70,000.00 loan memorialized in the June 9, 2014 promissory note be included in the new promissory note secured by the MLB pension (Filing No. 49-2 at 22, 23, 55). When the Bilbijas asked Lane how the promissory note secured by the MLB

---

[1] Lane provides testimony that Mrs. Bilbija asked to include language in the promissory note about the MLB pension, and she provided the language for the provision (Filing No. 49-6 at 20–22).

4

pension would work, Lane explained that the Bilbijas would simply send the note to the MLB office, and MLB would start garnishing Thompson's pension. *Id.* at 51.

The Bilbijas and Thompson signed the promissory note secured by the MLB pension at the time of their joint meeting at Lane's law office ([Filing No. 49-6 at 17](#)–18). After they signed the note, Lane "signed off on all [their] names" as a witness ([Filing No. 49-2 at 27](#)). "[H]e signed it off, verbally, that he represented all of [them]." *Id.* The Bilbijas and Thompson signed a second promissory note during the meeting, which provided an additional repayment option involving Thompson's other business venture ([Filing No. 49-4 at 2](#)–3). Lane notarized this promissory note, but he did not prepare the document (*Id.*; [Filing No. 49-2 at 41](#)).

After the promissory note secured by the MLB pension was executed, the Bilbijas loaned the additional money to Thompson by wiring the money to his criminal defense attorney. Thompson failed to pay back the money that he owed the Bilbijas. Mrs. Thompson informed the Bilbijas in August 2014 that their financial situation was very bad, and they might file for bankruptcy. The Bilbijas later learned that Thompson filed for bankruptcy. The Bilbijas contacted the MLB pension authorities to receive payment under the promissory note secured by the MLB pension, and they learned that Thompson's pension was subject to execution only for child support or similar debts and a judgment would be necessary ([Filing No. 49-2 at 26](#), 31–32, 44–45, 48, 51).

In response to these developments, the Bilbijas filed this lawsuit against Lane, asserting claims for legal malpractice and conflict of interest ([Filing No. 1-2 at 7](#)–18). After filing his Answer denying liability, Lane moved for summary judgment on the claims.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.  DISCUSSION

Lane argues that no attorney-client relationship existed between him and the Bilbijas, so there is no basis for the Bilbijas' legal malpractice claim against him.  Furthermore, even if an attorney-client relationship existed, Lane argues that he exercised ordinary skill and knowledge, and his conduct did not cause the Bilbijas' alleged damage.  Additionally, Lane asserts that Count II of the Complaint—conflict of interest—fails to state a legally cognizable claim.  The Court will first address the conflict of interest claim and then address Lane's claim concerning legal malpractice.[2]

### A.     **Conflict of Interest Claim**

Lane asserts that the Bilbijas' conflict of interest claim is premised on their allegation that Lane represented both Thompson and the Bilbijas in the promissory note transaction, which created an unwaivable conflict of interest.  He argues that a conflict of interest in violation of the Indiana Rules of Professional Conduct does not support an independent cause of action.  Lane relies on Seventh Circuit and Indiana case law that "it is quite clear that the Indiana Rules [of Professional Conduct] do not create a legal duty" and do not "create or describe any civil liability." *Rosenbaum v. White*, 692 F.3d 593, 604 (7th Cir. 2012); *Liggett v. Young*, 877 N.E.2d 178, 183 (Ind. 2007); *Sanders v. Townsend*, 582 N.E.2d 355, 359 (Ind. 1991).  Thus, the Bilbijas cannot bring an independent cause of action for an alleged conflict of interest.

The Bilbijas respond that Lane misconstrues Count II of the Complaint, as the claim is not simply alleging a violation of Indiana Rule of Professional Conduct 4.3.  Rather, they explain,

---

[2] The Bilbijas' first argument in response to the Motion for Summary Judgment is that Lane failed to strictly comply with Local Rule 56-1(a), and on this basis alone, Lane's Motion should be denied. They argue that Lane failed to include in his brief a section entitled "Statement of Material Facts Not in Dispute," supported by citation to designated evidence. Rather, this section of Lane's brief contains legal conclusions without citation to evidence. The Court notes, however, that the very next section of Lane's brief contains a recitation of the relevant facts with citation to the designated evidence. Therefore, the Court concludes that this argument from the Bilbijas is unavailing.

"Lane's violation of this Rule supports a finding [that] he failed to exercise ordinary skill and knowledge in his dual legal representation of both them and Mr. Thompson." ([Filing No. 49 at 32](#).) The Bilbijas argue that Lane misreads the decision in *Rosenbaum* in that the court's opinion held the Rules of Professional Conduct do not support a claim of legal malpractice only where there is no attorney-client relationship because they do not create a duty where none otherwise exists. The Bilbijas assert that, in this case, an attorney-client relationship existed between them and Lane, and thus a duty does exist, so "the Rules may form a standard of conduct by which [Lane's] duty can be measured." *Rosenbaum*, 692 F.3d at 604. The Bilbijas also note that the *Rosenbaum* court held "these Rules may be used as non-conclusive evidence that a lawyer has breached a duty owed to a client." *Id*. They argue, "Lane's violation of Rule 4.3 therefore becomes relevant not only as evidence that he breached the duty owed to the Bilbijas, but also of the standard of conduct Lane was required to exercise to avoid dual representation or a conflict of interest." ([Filing No. 49 at 33](#).)

While the Bilbijas are correct that evidence of a conflict of interest and violation of Indiana Rule of Professional Conduct 4.3 may constitute evidence that an attorney breached a duty owed to his client, the case law is clear that the Rules of Professional Conduct do not create an independent cause of action for civil liability. The "Rules may form a standard of conduct by which a lawyer's duty can be measured," *Rosenbaum*, 692 F.3d at 604, and they may help a client prove a breach to support a legal malpractice claim, but they do not support a separate claim independent of a legal malpractice claim. Therefore, the Court **grants** Lane's Motion for Summary Judgment and dismisses Count II of the Complaint—conflict of interest—but emphasizes that the facts and arguments alleged under Count II may be used to bolster the Bilbijas' claim for legal malpractice under Count I.

**B.     Legal Malpractice Claim**

Count I of the Complaint alleges a claim for legal malpractice. Lane argues that no attorney-client relationship existed between him and the Bilbijas, so there is no basis for their legal malpractice claim against him. Lane also argues that, even if an attorney-client relationship existed, he did not breach any duty because he exercised ordinary skill and knowledge, and his conduct did not cause the Bilbijas' alleged damage.

**1.     Existence of an Attorney-Client Relationship**

Under Indiana law, an attorney-client "relationship is consensual, existing only after both attorney and client have consented to its formation. A would-be client's unilateral belief cannot create an attorney-client relationship." *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991) (citations omitted). Lane points to the Seventh Circuit opinion from *Rosenbaum* for the proposition that more than just assumptions or an impression that an attorney-client relationship exists are necessary to impose liability on an attorney. *See Rosenbaum*, 692 F.3d at 602–04. He argues that the evidence shows he did not consent to the formation of an attorney-client relationship with the Bilbijas, but rather, he had a very brief, limited attorney-client relationship with Thompson only. The Bilbijas asked Thompson to contact a lawyer on their behalf, and Thompson responded that he had an attorney who could draw up the promissory note for "us". Lane was not present during these discussions between Thompson and the Bilbijas. He did not know he would meet the Bilbijas and never spoke with them prior to their unexpected appearance in his office for his meeting with Thompson. Thompson never communicated to Lane that the Bilbijas expected him to represent both parties.

"An attorney-client relationship need not be express; it may be implied by the conduct of the parties. However, there must be evidence of a consensual relationship, existing only after both

9

the attorney and client have consented to its formation." *Id.* at 601 (citation omitted). Lane asserts that the evidence suggests consent to an attorney-client relationship ran from the Bilbijas to Lane but not the other way around, and the Bilbijas relied on statements made by Thompson, not by Lane. He argues that his actions of revising the promissory note cannot be construed to infer that he was consenting to be the attorney for both parties. Relying on *Hacker*, 570 N.E.2d at 956–57, Lane argues that no prior relationship between him and the Bilbijas supports a finding of an attorney-client relationship, and the mere preparation of documents and overseeing their execution is insufficient to create such a relationship.

Lane also argues the Bilbijas' belief that he was acting as their attorney was not reasonable, and they could not have reasonably relied on any of his actions or statements to create an attorney-client relationship. The Bilbijas did not exclusively rely on Lane's actions or statements, but rather, they relied on Thompson and also on language provided from a different document prepared by a different attorney. Lane's addition of the language about the MLB pension was done at the request of Mrs. Bilbija, and the language was provided to Lane. Thus, Lane argues that he was performing only a clerical function.

The Bilbijas respond that evidence supports the existence of an attorney-client relationship between them and Lane, and thus, summary judgment is not appropriate. The Bilbijas reemphasize the principle from *Hacker* and *Rosenbaum* that an attorney-client relationship need not be express; rather, it may be implied by the conduct of the parties. They also explain that the "[c]reation of an attorney-client relationship is not dependent upon the formal signing of an employment agreement or upon the payment of attorney fees." *In re Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995).

The Bilbijas have designated in the evidence deposition testimony where Lane verbally communicated to them that he was acting as their attorney. There is evidence that they paid Lane

$250.00 as "their half" of the payment for his legal services, and Lane accepted the payment. This payment, the Bilbijas assert, is a strong indicator that an attorney-client relationship existed.

Concerning an implied attorney-client relationship, the Bilbijas point to the Indiana Supreme Court case of *In re Anonymous*. There, the court explained,

> Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance. . . . An important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice.

*Id.* at 70 (citations omitted). In *In re Anonymous*, the court implied an attorney-client relationship based on the parties' conduct even though the attorney did not consider the individual to be his client. The court noted that the attorney should have known the individual believed he was acting as his attorney, and the attorney did nothing to dispel that belief. *Id.* at 70–71.

In this case, there is evidence of an implied attorney-client relationship in addition to an express relationship. Lane met with both the Bilbijas and Thompson in his office for approximately two hours. During the meeting, they discussed legal matters, Lane drafted at least one provision in the promissory note, made other revisions to the document, and answered questions about the note and security provision. When the Bilbijas asked if they needed a different attorney, Lane responded that they did not because he specialized in this area of the law. Lane admits that he did not believe the Bilbijas were represented by another attorney, did not counsel them to seek another attorney, did not tell them he was not their attorney, and did not tell them he was only Thompson's attorney. While Lane did not execute a written fee agreement with the Bilbijas, he also did not execute a written fee agreement with Thompson. The Bilbijas assert that they sincerely believed Lane was acting as their attorney during the transaction, and they would have walked out of his office if they had known he was not acting as their attorney.

11

Lane adamantly maintains he did not represent the Bilbijas and never communicated to them that he represented them, and on the other hand, the Bilbijas steadfastly insist that Lane communicated through words and actions that he did represent them throughout the promissory note transaction. Each parties' position finds some support in the evidence; however, summary judgment proceedings are not the mechanism by which factual disputes are weighed and resolved. Because the evidence gives rise to a factual dispute, the Court determines that summary judgment is not appropriate on the issue of the existence of an attorney-client relationship between Lane and the Bilbijas.

## 2. **Breach and Causation**

Regarding the other elements of a legal malpractice claim, Lane asserts that there is no evidence that he failed to exercise ordinary skill and knowledge when preparing the promissory note, and his acts or omissions were not the sole cause of any damage suffered by the Bilbijas. He points out that the Bilbijas' own expert witness testified that the promissory note was valid and enforceable, and thus, Lane asserts, he used ordinary skill and knowledge in this case. *See* Filing No. 46-8 at 13.

In determining liability for legal malpractice, Indiana courts apply the rule of "but for causation," which means that the alleged harm would not have occurred "but for" the defendant's conduct. *Devereux v. Love*, 30 N.E.3d 754, 763 (Ind. Ct. App. 2015). Lane argues that the Bilbijas cannot prove their inability to collect on Thompson's outstanding debt resulted "but for" any conduct by him. He asserts that the Bilbijas chose to loan money to Thompson knowing that he was in financial and legal trouble. The provision regarding the MLB pension was added at Mrs. Bilbija's direction and was to be the last resort for repaying the debt. Furthermore, Lane argues, the Bilbijas are still able to attempt to collect on Thompson's debt because it was not included in

his bankruptcy proceeding. Therefore, Lane argues, there is no evidence that his conduct was the "but for" cause of any damage to the Bilbijas.

In his reply brief, Lane asserts that, under Indiana case law, an intervening cause may break the chain of causation and cut off a defendant's liability. *See Hedrick v. Tabbert*, 722 N.E.2d 1269, 1273 (Ind. Ct. App. 2000). He argues there is no evidence that he acted deficiently, and the actual cause of the Bilbijas' alleged loss was Thompson's chapter 13 bankruptcy filing. Lane could not have done anything to prevent Thompson from filing bankruptcy. He also asserts that it is speculative that Thompson's bankruptcy filing prevents the Bilbijas from recovering from Thompson. Because Thompson did not schedule the Bilbijas as creditors during the bankruptcy proceeding, they might still be able to collect from him.

The Bilbijas respond that the evidence supports the elements of breach and causation. While their expert witness provided limited deposition testimony that the promissory note was valid and enforceable, the Bilbijas argue that Lane misses the point—they did not want a standard promissory note; they wanted a secured promissory note. Lane knew that they wanted security, and he made changes to the promissory note to make it stronger and to securitize and guarantee it. "Lane either did not understand that the MLB Pension could not be securitized or that he lied to the Bilbijas. (*See* Exhibit B, p. 56: 9-16) (Lane advised the Bilbijas that they simply had to send the Promissory Note Secured by MLB Pension to the MLB to start garnishment.)." ([Filing No. 49 at 28](#).) The Bilbijas argue that, in either event, Lane's actions were negligent legal representation.

The Bilbijas further argue that Lane ignored the additional testimony from their expert witness, who opined that Lane was negligent in representing both Thompson and the Bilbijas because of the obvious conflict of interest ([Filing No. 49-8 at 20](#)). They assert this evidence creates

13

a dispute of fact that must be resolved by the trier of fact, and the existence of a breach is generally a question of fact not suitable for summary judgment.

Regarding the element of causation, the Bilbijas assert that they agreed to loan Thompson additional money only because he agreed to provide a security interest in the MLB pension. Lane helped prepare and finalize the "secured" promissory note, and, according to Mrs. Bilbija, Lane assured them that the secured promissory note was ironclad and guaranteed. But the promissory note failed to provide any security to the Bilbijas at all. The Bilbijas argue that Lane's "failure to properly obtain a security interest or to fail to advise the Bilbijas that no such security interest was possible here is the crux of the case." ([Filing No. 49 at 30](#).) The Bilbijas point out that a defendant can be liable for negligence even if he was not the "sole proximate cause" of an injury, and proximate cause is generally a question for the trier of fact. *See Lucas v. Dorsey Corp.*, 609 N.E.2d 1191, 1199 (Ind. Ct. App. 1993); *New York R. Co. v. Cavinder*, 211 N.E.2d 502, 508 (Ind. Ct. App. 1965). The evidence shows they would not have loaned Thompson additional money if they had understood that the interest was not secured by the MLB pension, and Lane made representations to them concerning that security interest.

Concerning Lane's assertion that the Bilbijas knew of Thompson's financial and legal troubles and this was an intervening cause of their injury, the Bilbijas respond that this is exactly why they wanted a security interest in the promissory note. They argue, "It is unreasonable to blame the Bilbijas for an allegedly risky financial decision when they sought Lane's guidance and expertise in order to protect themselves from that exposure to loss." ([Filing No. 49 at 31](#).)

The Court first notes that "[w]hether a particular act or omission amounts to a breach of an attorney's duty is generally a question of fact for the jury." *Devereux*, 30 N.E.3d at 763. Additionally, "proximate cause is generally a question of fact." *Bunger v. Brooks*, 12 N.E.3d 275,

282 (Ind. Ct. App. 2014). When considering proximate cause, "[t]he defendant's act need not be the sole cause of the plaintiff's injuries; it needs to be only one of the proximate causes rather than a remote cause." *Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010) (citation omitted). There is support in the designated evidence for the parties' conflicting positions regarding breach and causation. There is a factual dispute regarding the amount of Lane's involvement in the securitization of the promissory note and his representations concerning the security. Lane's alleged statements regarding the MLB pension and garnishing those funds, as well as a potential conflict of interest in representing both parties, create disputes about breach and causation that should be resolved by the trier of fact.

Lane relies on *Hedrick* to argue that intervening causes broke the chain of causation and cut off any potential liability. However, *Hedrick* also explains that intervening causes must not be reasonably foreseeable at the time of the defendant's conduct. "[W]here the injuries could not, as a matter of law, have been reasonably foreseen due to the unforeseeability of an intervening, superseding cause, summary judgment may appropriately be entered." *Hedrick*, 722 N.E.2d at 1273. There is evidence to suggest Thompson's failure to repay the Bilbijas and his subsequent bankruptcy were reasonably foreseeable. However, the evidence is not so clear and undisputed to decide proximate cause and intervening causes as a matter of law. Additionally, as already noted, proximate cause does not require a defendant's conduct to be the sole cause of the plaintiff's injuries.

As the Seventh Circuit has aptly observed, "Certainly, the evidence is of varying strength against [the] defendant, but at this stage we do not weigh the proof, make credibility determinations, or resolve narrative disputes. Those tasks are left for the trier of fact." *Ortiz v. City of Chi.*, 656 F.3d 523, 534 (7th Cir. 2011); *see also United States v. Funds in the Amount of*

15

*One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 717 (7th Cir. 2013) ("[W]eigh[ing] the strength of the evidence or mak[ing] credibility determinations [are] tasks belonging to the trier of fact. At summary judgment, whether the movant's evidence is more persuasive than the evidence of the non-movant is irrelevant. The only question is whether the evidence presented, reasonably construed in the light most favorable to the non-movant, creates a genuine dispute regarding any material fact precluding judgment as a matter of law.") (citations omitted).

## IV. CONCLUSION

For the foregoing reasons, Lane's Motion for Summary Judgment is **GRANTED in part and DENIED in part** ([Filing No. 44](#)). The Bilbijas' claim for conflict of interest is **dismissed**. Their claim for legal malpractice against Lane may proceed to trial.

**SO ORDERED.**

Date: 5/10/2018

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Robert Joseph Nice
THE NICE LAW FIRM
rjnice@nicelawfirm.com

John G. Shubat
THE NICE LAW FIRM
jgshubat@nicelawfirm.com

Briane M. House
SKILES DETRUDE
bhouse@skilesdetrude.com